UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

DALE RITCHIE and
LINDA SHARON RITCHIE,

    Debtors.

No. 14-11863-tl7

PHILLIPS 66 COMPANY,

    Plaintiff,

v.

Adv. No. 14-01112

DALE RITCHIE a/k/a FERRY DALE RITCHIE
d/b/a RITCHIE REAL ESTATE
d/b/a RITCHIE DISTRIBUTING COMPANY and
LINDA SHARON RITCHIE,

    Defendants.

## **MEMORANDUM OPINION**

    Before the Court is Plaintiff's request that Defendants' bankruptcy discharge be denied under §§ 727(a)(2), (a)(4), and/or (a)(5).[1] The main issue is whether Debtors' conveyance of real estate with certain reconveyance rights constituted a fraudulent concealment. Also raised is the effect of Defendants' failure to list certain property rights, including rental income, on their bankruptcy schedules. After trial on the merits, the Court finds that Plaintiff did not carry its burden of proving that Defendants did anything warranting discharge denial.

---

[1] Unless otherwise noted all statutory references are to 11 U.S.C.

I.     FINDINGS

The Court finds the following facts: [2]

Dale and Linda Ritchie owned and operated gas stations and convenience stores in Alamogordo, New Mexico and the surrounding area. After graduating from high school in Sardinia, Ohio in 1956, Mr. Ritchie moved to Alamogordo in 1957 and began working at a gas station. In about 1960 Ritchie bought a gas station and went into business for himself.

In 1982 the Ritchies bought a local gasoline wholesaling and retailing business from Glover Distributing Company, and began Ritchie Distributing. They incorporated the business in 1986.

Since at least 1985, Ritchie Distributing had a contract with Phillips 66, later ConocoPhillips ("Phillips") to purchase gasoline and related products. At one time Ritchie Distributing had about nine gasoline stations/convenience stores operating under the Phillips or Conoco brands, employing about 60. Peak sales volume was about $12 million a year.

Under a "Branded Marketer Agreement" with Phillips, Ritchie Distributing was required to buy a certain amount of gasoline and comply with Phillips' branded marketing rules and standards. The most recent BMA was signed effective April 1, 2008. In October 2006 Ritchie Distributing also signed a number of Customer Status Update forms ("CSUs") that modified the BMA. Under the CSUs, Phillips advanced money to Ritchie Distributing so certain of its gas stations could be modernized. Phillips agreed to forgive repayment of the funds advanced if

---

[2] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties. In making these findings, the Court took judicial notice of the docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may, sua sponte, take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("[t]he bankruptcy court appropriately took judicial notice of its own docket").

Ritchie Distributing purchased minimum amounts of fuel for a specified number of years.

The Ritchies owned the real property on which the gasoline stations were located, and leased the land and improvements to Ritchie Distributing. The leases were oral. The Ritchies apparently borrowed money from local banks (First National Bank of Alamogordo and Bank 34) to buy the real estate. At any rate, all of the Ritchies' real estate[3] was encumbered by mortgages to the banks, securing a total debt of approximately $2.1 million.[4]

The Ritchies also borrowed $800,000 from Chris and Diana Chavez in early 2006. It could be that the money was used to modernize the Ritchies' gas stations, but there is not enough evidence in the record to make such a finding. The debt to the Chavezes was secured by a junior lien on the Properties.

Ritchie Distributing fell on hard times during the Great Recession of 2008. The gas station modernizations, which might have been successful in better times, were insufficient to withstand the economic downturn. Ritchie Distributing's revenues fell substantially after 2008.

Two major problems resulted from Ritchie Distributing's revenue decline. First, Ritchie Distributing could not meet its fuel purchase quotas under the BMA. In response, Phillips terminated the BMA for default in July, 2010. Termination meant that Ritchie Distributing could no longer sell Phillips branded gasoline, had to remove all Phillips signage, and could no longer sell gasoline via credit card. Sales plummeted. In addition, termination triggered Ritchie Distributing's obligation to repay Phillips for the funds advanced to modernize the gas stations. The total amount due was about $267,000. Phillips made demand for this amount in December, 2010, but did not pursue collection until April, 2013.

---

[3] The Ritchies owned approximately 20 parcels of real estate, including the operating gasoline stations/convenience stores, former gas stations and restaurants, vacant land, commercial lots, the house they lived in, and two rental houses in Alamogordo (together, the "Properties").

[4] In addition, the Ritchies owed First American Bank $63,500 and Western Plains Inc. $53,192.

Second, beginning in late 2008 Ritchie Distributing was unable to pay enough rent for the Ritchies to service the mortgage debt to First National Bank, Bank 34, and the Chavezes. In November, 2009 First National filed a foreclosure action in Las Cruces. Bank 34 filed two additional foreclosure actions in March, 2010, in Las Cruces and Carrizozo.

The Ritchies tried to refinance their debt and pay off the foreclosing banks. No banks were interested. The Ritchies also approached the Chavezes for a takeout loan. The Chavezes considered the request seriously, since their position was at risk, but in the end declined to loan more money.

The Ritchies also attempted to sell some of the Properties to pay off the bank debt. They retained C. Michael Shyne, ("Shyne") an Alamogordo real estate broker, for the sales effort. The attempt did not bear fruit, in part because they would have had to sell enough of the Properties to a single buyer to pay off the banks and convey clear title.

Faced with the threat of losing everything to foreclosure, in April 2011 the Ritchies entered into a Loan Agreement with R&R, LLC, a New Mexico limited liability company owned by Mr. Shyne. The essential terms of the Loan Agreement were:

- R&R would try to negotiate a discounted cash payoff to the banks, in exchange for 10% of any discount agreed to;
- R&R would loan the Ritchies the discounted payoff amount ($1,450,000) so the banks would be paid in full. Interest would accrue at 10%;
- The Ritchies would execute warranty deeds to R&R for all of the Properties;
- R&R would market and sell the Properties, with or without input from the Ritchies, (using Mr. Shyne as the listing broker at 10% commission), and would apply the net sales proceeds to the loan balance;
- The Ritchies were obligated to make $290,000 payments per year;
- If the Debtors defaulted under the Loan Agreement, R&R had the right to demand possession of the properties and to sell the properties without consulting the Ritchies;
- Once the loan was repaid in full, the remaining real estate would be reconveyed to the Ritchies;
- The Chavezes would release their junior lien on the Properties and record

- a new mortgage, after the Ritchies had conveyed the Properties to R&R. The mortgage would attached to any of the Properties reconveyed by R&R to the Ritchies;
- The Ritchies would continue to occupy, operate, and/or lease some, but not all of the Properties;
- The Ritchies had the obligation to pay for maintenance, insurance, and taxes on the Properties;
- R&R was given the right to buy one of the Properties, located at 3301 N. White Sands Blvd. in Alamogordo, for a bargain price of $25,000, subject to certain conditions.[5]

Mr. Shyne drafted the Loan Agreement, incorporating some comments from Mr. Ritchie. Mr. Shyne insisted on structuring the transaction using an outright conveyance of the Properties rather than a mortgage. Mr. Shyne believed he could avoid the foreclosure process in this way, and be able to quickly convey parcels of property to any buyers. In Mr. Shyne's opinion, owning the Properties outright was more "iron-clad" than taking a mortgage. Mr. Ritchie asked Mr. Shyne if he would take a mortgage on the Properties instead of an outright conveyance, but Mr. Shyne declined.

The Ritchies thought the transactions outlined by the Loan Agreement were better than their only realistic alternative, i.e., losing the Properties to foreclosure. They concluded that the transaction gave them a chance to retain whatever equity they might have. Had Mr. Shyne been able to sell the Properties for anything close to the values projected in April, 2011, the Ritchies would have been able to preserve significant equity. This would have benefited the Ritchies'

---

[5] Shyne was not entitled to obtain ownership of 3301 N. White Sands until the majority of the loan has been paid off or properties sold. Obtaining title to 3301 N. White Sands was a major inducement for Shyne to loan the Ritchies $1,450,000. Shyne wanted the parcel because it was "blighted" and brought down the value of surrounding property he owned. The value of the parcel was and is unclear. While at times listed for $800,000 to $1.2 million, the parcel is a closed bulk gasoline plant. The Ritchies had the obligation to do environmental remediation on the site, and the $25k payment was to facilitate removal of the fuel tanks. Shyne did not receive immediate possession of the parcel, which was a further inducement for Shyne to sell the remaining Properties.

unsecured creditors, including Phillips.

Ritchie Distributing did not have to pay R&R rent on for the Properties it used, but did have to maintain the Properties, pay property taxes, and keep insurance in place. Debtors later bought back their home from R&R.

The Court finds that the transaction with R&R was arms-length, did not involve an insider, and provided the Ritchies with reasonably equivalent value.

Phillips filed a collection action against the Ritchies in April 2013. The parties reached a settlement a year later, under which the Ritchies agreed to pay Phillips $170,000 by a date certain. The Ritchies did not make the payment, so in June, 2014 Phillips obtained a stipulated judgment against the Ritchies for $325,000. The Ritchies filed this bankruptcy case shortly thereafter.

The Ritchies' Schedule B contains the following disclosure:

On or about April 15, 2011, Debtors transferred property rights in various commercial properties as an assignment of collateral to R&R, LLC (not affiliated with Debtor). In exchange, R&R, LLC loaned Debtors $1,450,000 to pay off various other creditors to prevent foreclosure on the properties. The properties are also encumbered by a loan from Chris and Diana Chavez for $746,648 for the same purpose. The Agreement between the parties calls for the sale of the properties to service the debt. Upon paying off the debt, if any properties remain, the properties shall revert back to the Debtors. At this time, due to the downturn in the market and current environmental problems associated with the properties, Debtors do not believe that they will receive any of the properties back.

The value of the Properties is disputed. Shyne's real estate company, Westsource Corporation, has listed the Properties for sale at a combined price between $4 and $6 million. Since 2011, however, only three parcels other than their home have sold, at prices substantially below the list prices. Mr. Ritchie testified that, although he would like to get $6 million, the Properties probably were likely not selling because they were old gas stations, and he doubted they would sell for anything near $4-$6 Million. The Properties may have so little value that

R&R will not collect its $1,450,000 loan.

The Ritchies did not list on their bankruptcy schedules rent payable on three of the commercial parcels conveyed to R&R. The basic facts are:

| Parcel | Monthly Rent/Lease terms | Mr. Ritchie's reason for nondisclosure |
|---|---|---|
|  |  |  |
| 1704 E. Tenth St., Alamogordo (car repair shop) | $1,000/ month to month lease | The rent was paid to Ritchie Distributing, not the Ritchies; the Ritchies never saw the money; it was paid directly to Pioneer Title, to be applied to the R&R loan; |
| 620 N. White Sands, Alamogordo (transmission repair shop) | $500/ oral month to month lease | The rent was paid to Ritchie Distributing, not the Ritchies; the Ritchies never saw the money; the money was used to pay maintenance and utilities on the parcel. Shyne terminated the lease in December, 2014 |
| 3301 N. White Sands, Alamogordo (truck parking) | $500/ one year lease terminable at will by either party at any time | The rent was paid to Ritchie Distributing, not the Ritchies; the Ritchies never saw the money; the money was used to pay maintenance and utilities on the parcel. Furthermore, post-petition the tenant (Sysco) stopped paying rent, and offset its monthly rental obligation with amounts Ritchie Distributing owed it. |

The Court finds Mr. Ritchie's testimony credible regarding the commercial rent. The rent the Ritchies actually received (on the rental houses) they did disclose. The commercial rent, while technically theirs, the Ritchies reasonably viewed as Ritchie Distributing's money, and was never collected by the Ritchies personally or spent by them. A more meticulous filer, such as an accountant perhaps, might have included the business rent on his personal schedules, but there is no indication the Ritchies had any fraudulent intent when they omitted the commercial rent.

After the first creditors' meeting on July 22, 2014, Debtors provided the case trustee copies of the Loan Agreement, promissory note, properties values and commercial leases, and

corporate tax returns. These documents disclosed Debtor's possessory and equitable interests in the Properties, including their right to receive rent for 1704 E. Tenth and 630 N. White Sands.[6] The documents were provided at the request of the trustee, who asked about the R&R transaction at the creditors' meeting. The Ritchies emailed the documents six days after the meeting.

The Court finds there was no unexplained loss or shrinkage of assets.

## II. DISCUSSION

### A. General Nondischargeability Standards.

"Denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor. The provisions denying the discharge are construed liberally in favor of the debtor and strictly against the creditor." *In re Mosley*, 501 B.R. 736, 742 (Bankr. D.N.M. 2013) (citation omitted). "Completely denying a debtor his discharge … is an extreme step and should not be taken lightly." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993). However, the "fresh start" policy embodied in the Bankruptcy Code is limited to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (quotation omitted).

### B. § 727(a)(2)(A) (Fraudulent Concealment).

Phillips first argues for denial of the discharge under § 727(a)(2)(A), which provides that a debtor shall be granted a discharge unless:

> the debtor, with intent to hinder, delay, or defraud a creditor… has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor within one year before the date of the filing of the petition.

To prevail, Phillips must show, by a preponderance of the evidence, that "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the [debtor], (3) within

---

[6] The rent for 3301 N. White Sands (which was being offset by the tenant at the time) was not disclosed because the parcel was not listed for sale, per the terms of the Loan Agreement, so it was not mentioned in the documents the Ritchies sent to the trustee.

one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor." *In re Gordon,* 526 B.R. 376, 388 (10th Cir. BAP 2015) (alteration in original), quoting *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1293 (10th Cir. 1997).

The transaction evidenced by the Loan Agreement occurred more than three years before the petition date. Phillips therefore proceeded under a concealment theory because, as discussed below, "continuing" concealments are deemed to occur within a year pre-petition, even though the concealment began long before.

Concealment, in general, is when a debtor hides property or withholds information about an asset otherwise required to be disclosed by law. *In re Recupero,* 2014 WL 1884331, at *7 (Bankr. N.D. Ohio 2014) (citing cases and examples of concealment). Obvious examples include hiding a car, jewelry, or precious metals. *See, e.g., In re Penner*, 107 B.R. 171, 173 (Bankr. N.D. Ind. 1989) ("[t]here can be no doubt that a debtor who consciously hides property which he owns, in an effort to deprive his creditors of it, is guilty of a concealment which requires a denial of the discharge").

There is no evidence the Ritchies hid any of their personal property, so this case is not about a run-of-the-mill concealment. However, there is a type of concealment that consists of "[t]he transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own." *Friedell v. Kauffman (Matter of Kauffman)*, 675 F.2d 127, 128 (7th Cir. 1981); *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987). In *Gordon,* the Tenth Circuit BAP stated:

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property. Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret

interest—a secret interest of which retention of the benefits of ownership may be evidence.

526 B.R. at 389, quoting *Rosen v. Bezner*, 996 F.2d 1527, 1532 (3d Cir. 1993).

The *sine qua non* of a transfer/concealment case is that the transfer in question is a sham, designed by the wily debtor to put the transferred asset out of the reach of creditors while retaining the secret right to get the asset back later. *See, e.g., In re Olivier,* 819 F.2d 550, 553 (5th Cir. 1987 (to determine whether there had been a concealment, the court examined whether the transfer was a sham); *In re Hake*, 387 B.R. 490, 504 (Bankr. N.D. Ohio 2008) (concealment occurs when property is transferred in a sham transaction that is not supported by consideration); *Newton v. Essres (In re Essres)*, 122 B.R. 422, 425 (Bankr. D. Colo. 1990) (citing *Olivier*, the court held that the hallmark of a fraudulent concealment is a sham transaction). The *Gordon* court described the transfer/concealment as a "ruse." 526 B.R. at 389. *See also Matter of Vecchione*, 407 F. Supp. 609, 614 (S.D.N.Y. 1976) (transferred asset must, in effect, be held in trust for the bankrupt).

Here, it is not at all clear that there was a concealment, because the transfer to R&R was not a sham. Rather, as set discussed below in more detail, the Loan Agreement was a bona fide, arms-length deal that transferred valuable rights to R&R in exchange for a much-needed loan and the opportunity to save any net equity that otherwise would be lost to foreclosure. The transfer benefitted unsecured creditors such as Phillips. The rights of R&R and the Ritchies were spelled out in detail in the Loan Agreement.

Assuming *arguendo* that the transaction qualifies as a "concealment," the "continuous concealment" doctrine likely would bring it within § 727(a)(2)(A)'s one-year lookback period. "Under the 'continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year

period as long as the debtor allowed the property to remain concealed into the critical year." *Gordon,* 526 B.R. at 389, quoting *Rosen v. Bezner,* 996 F.2d at 1531. *See also In re Essres*, 122 B.R. 422, 426 (Bankr. D. Colo. 1990) (acknowledging the continuous concealment doctrine); *In re Fletcher*, 2015 WL 1239811, at *10 (Bankr. N.D. Okla. 2015).

Even if a continuous concealment were shown, Phillips would have to prove that the concealment was done with "*actual* intent to hinder, delay, or defraud creditors." *In re Warren,* 512 F.2d 1241, 1249 (10th Cir. 2008), quoting *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey),* 938 F.2d 1073, 1077 (10th Cir. 1991) (italics in original). *See also In re Wreyford,* 505 B.R. 47, 56-57 (Bankr. D.N.M. 2014); *Rosen v. Bezner*, 996 F.2d at 1533 (party must prove both a concealment within a year pre-petition, and improper intent—concealment could theoretically be innocent); *In re Gollomp*, 198 B.R. 433 (S.D.N.Y. 1996) (debtor's concealment of a loan receivable was innocent).[7]

To prove actual intent to defraud, courts often look for "badges of fraud." *Warren*, 512 F.3d at 1250, quoting *Carey*, 938 F.2d at 1077.[8] A number of badges have been identified, some relevant to the conversion of non-exempt assets to exempt assets, some to transfers, and some to transfer/concealment. The badges of fraud include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought

---

[7] There is analytical redundancy in determining whether a transfer/concealment occurred (was it a sham?) and whether any concealment was done with actual fraudulent intent. It would be unusual for the debtor to devise a sham transaction without the actual intent to defraud creditors. On the other hand, if a transaction was *not* a sham, and hence not a concealment, it would be unusual to find fraudulent intent. The nature of the transfer/concealment theory requires the duplication.

[8] However, "The cases . . . are peculiarly fact specific, and the activity in each situation must be viewed individually." *Warren,* 512 F.3d at 1250, quoting *Carey,* 848 F.2d at 1077. *See also In re Splawn*, 376 B.R. 747, 756 (Bankr. D.N.M. 2007) (inferences can be made from all circumstantial evidence, not just badges of fraud).

to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoted in *Wreyford,* 505 B.R. at 58-59.) The Court weighs the badges of fraud as follows:

| Factor | Discussion |
| --- | --- |
| | |
| Was there a lack of, or inadequate, consideration? | No. The Ritchies received $1,450,000 for the transfer, retained the use of the Properties pending sale, and retained the right to any net equity once the loan was paid in full. The transaction allowed the Ritchies to avoid losing everything to foreclosure. |
| Was there a familial, friendship, or close associate relationship between the parties? | Somewhat. Shyne was not a relative or insider, but he was friendly to the Ritchies. The Court finds that Shyne has and continues to try to sell the Properties for fair market value, thereby assisting the Ritchies in recovering whatever equity they may have. However, the Court also finds that Shyne is fully able to protect his own interests, and that he entered into the transaction to profit from it. |
| Did Debtors retain possession, benefit, or use of the properties in question? | Yes, but not for any fraudulent reason. Shyne demanded title to the Properties so he could sell them without going through foreclosure. He did not want to operate any businesses, only to sell real estate. The result was that the Ritchies continued to operate their businesses while R&R got fee title to the Properties and put them on the market. The transaction was unusual, but it was not fraudulent. |
| What was the financial condition of the party sought to be charged both before and after the transaction in question? | This factor weighs in favor of the Debtors. The Properties were encumbered with $2.9 million of mortgage debt. Without the Loan Agreement, there was no credible evidence that Debtors would have been left with anything had they allowed the foreclosure actions to go to sale. Debtors and their creditors were better off after the Loan Agreement transaction was closed. |
| The existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors? | This factor weighs in favor of the Debtors. The only challenged transactions are the ones outlined above. There was no pattern or series of questionable transactions or conduct. |

| | |
|---|---|
| The general chronology of events and transactions under inquiry? | This factor weighs in Debtors' favor. Debtors signed the Loan Agreement to avoid foreclosure, not because of the debt to Phillips. The transaction gave the Debtors some hope of realizing enough equity to pay Phillips. Phillips did not pursue its claim for almost three years after sending the demand letter. |

Overall, the analysis strongly favors the Debtors, as do the other, "non-badge" facts in this case. The Court finds and/or concludes that the Debtors lacked fraudulent intent to hinder or delay Phillips or any other creditor. Rather, they signed the Loan Agreement to avoid losing their equity in the Properties through foreclosure, and to keep operating their business pending a sale. *See, e.g.*, 6 Collier on Bankruptcy, ¶ 727.02[3][a] (Henry Sommer & Alan Resnick, eds., 16th ed.) ("Transfers made by debtors in an attempt to keep their business alive and satisfy creditors are not fraudulent"); *In re Miller*, 39 F.3d 301, 307 (11th Cir. 1994) (legitimate business purpose where debtor transferred nine properties to creditor "to obtain funds to keep their businesses alive while satisfying their largest creditor"). Had the Ritchies done nothing, the most likely result would have been the loss of everything, to the detriment of unsecured creditors. With the Loan Agreement transaction, the Ritchies gave themselves and their creditors a chance to retain value. The Ritchies' actual intent was honest, not fraudulent.

C. § 727(a)(4) (False Oath).

Phillips next contends that the Ritchies' discharge should be denied under § 727(a)(4), which states that the Court shall grant a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." To prevail under a § 727(a)(4) objection, the plaintiff must show: "(1) that the [d]ebtor made a false statement under oath; (2) that the [d]ebtor knew that the statement was false; (3) that [the debtor] made the statement with fraudulent intent; and (4) that the statement was material. *Mosley*, 501 B.R. at 742. (quoting *Rajala v Majors (In re Majors)*, 2005 WL 2077497, at *3 (10th Cir. BAP 2005). *See also*

*Gepner v. Kidd (In re Kidd)*, 2015 WL 6437480, at *9 (10th Cir. BAP 2015) (creditor must show that the debtor acted knowingly and fraudulently with respect to the misstatement or omission, and the misstatement or omission related to a material fact). "Omissions as well as affirmative statements made in a debtor's Statement of Financial Affairs and Schedules constitute statements under oath and can constitute a false oath for purposes of Section 727(a)(4)(A)." *Estate of Bishop v. Mulholland (In re Mulholland),* 2011 WL 4352293, at *4 (Bankr. D.N.M. Sept. 16, 2011) (citations omitted)). On the other hand, "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge." *Gullickson v. Brown* (*In re Brown)*, 108 F.3d 1290, 1294-95 (10th Cir. 1997) (citation omitted).

Phillips first argues that Debtors ran afoul of § 727(a)(4) when they failed to schedule their "equitable" interest in the Properties. The Court disagrees, and concludes that their description, which appears on Schedule B, paragraph 19, is reasonably detailed and accurate. Further, on Schedule A the Ritchies referred to the entry in Schedule B. While "[n]umerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately," *In re Mohring,* 142 B.R. 389, 394 (Bankr. E.D. Cal. 1992), *aff'd*, 153 B.R. 601 (B.A.P. 9th Cir. 1993), *aff'd*, 24 F.3d 247 (9th Cir. 1994), "[t]here are . . . no bright-line rules for how much itemization and specificity is required. What is required is reasonable particularization under the circumstances." *Id*. at 395.

Moreover, Debtors did not make a false statement when they stated it was unlikely they would receive any of the Properties back. The Court finds both Shyne's and Ritchie's testimony credible that, on the petition date, they did not believe the Ritchies would get anything back under the Loan Agreement, because of interest accrual and the weak market for closed gasoline

stations. The outcome remains uncertain today.[9]

Phillips also argues that Debtors intentionally omitted from their schedules $2,000 in monthly rent from three of the commercial parcels. There is no question that the rent is not disclosed. However, the Court finds that the omission was not intentional or fraudulent, but instead was an innocent oversight. Mr. Ritchie's testimony was credible that he considered the commercial rent as Ritchie Distributing's income, not Debtors', and thus saw no need to schedule it. The testimony was supported by Ritchie's practice, on his accountant's advice, of reporting the commercial rent as Ritchie Distributing's income for tax purposes, while reporting the residential rent as the Debtors' income (the Debtors disclosed the residential property income on Schedule I).

Furthermore, the Court finds no motive for the Debtors to omit the commercial rent on purpose, as they did not keep the rents for themselves. Rather, in one case the rent went to R&R, in one case the rent was retained by the tenant as an offset, and in the third case Ritchie Distributing kept the money and paid bills with it. The Debtors never received a penny.[10]

---

[9] Although not specifically mentioned by Phillips, the Ritchies did not disclose their right to possess the Properties pending sale. The Court finds that this omission was innocent, based in part on the fact that, at the first meeting of creditors, the trustee asked about the Ritchies' interest in the Properties. The Ritchies answered all questions and promptly sent the trustee the Loan Agreement and related documents, which plainly lay out Debtor's possessory interest in the Properties. *See, e.g., In re Brown*, 108 F.3d at 1294 ("[n]o inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud") (italics omitted); *In re Mereshian*, 200 B.R. 342, 346 (9th Cir. BAP 1996) (quoting *In re Adeeb,* 787 F.2d 1339, 1345 (9th Cir. 1986)) (a "debtor who fully discloses his property transactions at the first meeting of creditors is not fraudulently concealing property from his creditors"); *In re Fink*, 351 B.R. 511, 527 (Bankr. N.D. Ill. 2006) ("Although a debtor cannot necessarily redress a false oath by making a subsequent correction, the fact that a debtor comes forward with omitted material of his own accord is evidence that there was no fraudulent intent in the omission.") (citation omitted).

[10] In fact, the undisclosed rent indirectly benefited unsecured creditors because it reduced the Ritchies' obligations under the Loan Agreement, thereby increasing any return of equity to the estate. This bolsters the conclusion that the Ritchies lacked fraudulent intent when they failed to

-15-
Case 14-01112-t    Doc 52    Filed 12/14/15    Entered 12/14/15 16:52:57 Page 15 of 18

The Court notes that there is no pattern of nondisclosure, and Debtors are not attorneys or sophisticated business people. The commercial rent was not hidden to keep it from the trustee. These factors distinguish this case from *In re Calder*, 907 F.2d 953 (10th Cir. 1990) (sophisticated businessman omitted multiple items from schedules, including income that he hid in wife's bank account), and *In re Garland*, 417 B.R. 805 (10th Cir. BAP 2009) (sophisticated attorney made overwhelming number of omissions, hid assets with family, and had disclosed bank accounts).

    D.    § 727(a)(5) (Unexplained Loss of Assets).

Finally, Phillips seeks to deny the Ritchies' discharge under § 727(a)(5), which applies where the debtor "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Phillips has the burden of proving that a "loss or shrinkage of assets actually occurred." *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001). If the burden is carried, it then shifts to Debtors "to explain the loss or deficiency of the assets in a satisfactory manner." *Id*.

Phillips argues that under New Mexico law, the Debtors really only granted a mortgage to Shyne, and have not satisfactorily explained why the Properties are not part of the bankruptcy estate. This weak argument is overruled. The purpose of § 727(a)(5) is to make sure the trustee and creditors have documentation to trace how assets were depleted, not to dispute whether a property right is properly characterized. *See, e.g., In re Self*¸ 325 B.R. 224, 251 (Bankr. N.D. Ill. 2005) (to be satisfactory, an explanation must be "supported by at least some documentation" and the documentation "must be sufficient to eliminate the need for the court to speculate as to

---

disclose the rent. It also contrary to Phillips' argument that the omission was material.

what happened to all the assets"). Here, Debtors have fully disclosed and documented the Loan Agreement transaction to the Court, the trustee, and creditors, including Phillips. There is no colorable § 727(a)(5) claim.

### III. CONCLUSION

The Debtors did not conceal their interest in the Properties, or else did so innocently. The Debtors did not make a false oath on their schedules or in connection with this bankruptcy case. Like almost all debtors, the Ritchies could have done a better job of documenting their assets and transactions, pre- and post-petition, but on the whole the Court is convinced that they are good, honest people who made no attempt to defraud their creditors or make false oaths, despite losing their business and life savings.

The Court will grant the Debtors a discharge. A separate judgment consistent with this opinion will be entered.

/s/ David T. Thuma
_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: December 14, 2015

Copies to:

Trey Arvizu
P.O. Box 1479
Las Cruces, NM 88004

Darin Lee Brooks
1300 Post Oak Blvd., Ste. 2000
Houston, TX 77056

John Gregory George, Jr.
1300 Post Oak Blvd., Ste. 2000

Houston, TX  77056